**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| ALENA KELLY, *Plaintiff*, v. DES MOINES UNIVERSITY, KIMBERLY BROWN and ALICIA LYNCH, *Defendants*. | Civil Action No. _____ **COMPLAINT** **(Jury Demanded)** |

COMES NOW, Plaintiff ALENA KELLY ("Plaintiff" or "Ms. Kelly"), by and through her undersigned counsel, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

## INTRODUCTION

Ms. Kelly seeks relief to remedy a breach of contractual rights and violations of Title IX of the Education Amendments of 1972 committed by Defendant Des Moines University ("DMU") and intentional infliction of emotional distress by Defendant DMU administrators Dr. Kimberly Brown and Alicia Lynch (together with DMU, "Defendants"). Following the report to other students of sexual harassment by a fellow student, Ms. Kelly was subjected to an ongoing and relentless campaign of harassment by fellow students hoping to have her removed from DMU. When Ms. Kelly reported the sexual harassment to administrators, DMU failed to take any action, and students retaliated by repeatedly reporting Ms. Kelly for alleged violations of DMU's Integrity Code.

Though failing to take any action in response to Ms. Kelly's complaints, Dr. Brown and Ms. Lynch responded to the allegations of other students against Ms. Kelly, subjecting Ms. Kelly

1

to multiple interrogations despite a lack of evidence. Dr. Brown and Ms. Lynch became fixated on identifying a code violation by Ms. Kelly, repeatedly interviewing numerous classmates in an attempt to identify such a violation and furthering the harassment of Ms. Kelly by suggesting that these students stay away from her and encouraging them to make further reports. These repeated investigations and interrogations caused substantial emotional and academic distress to Ms. Kelly.

DMU then suspended Ms. Kelly not based on a violation of any specific standards, but based on student gossip, jealousy, and DMU administration's desire to protect the personal reputations of some of its students. Ms. Kelly was ultimately forced to withdraw from DMU for her own health. Accordingly, Ms. Kelly now petitions this Court for redress in the form of damages, costs and reasonable attorney's fees in relation to the breach of contract, violation of Title IX and intentional infliction of emotional distress.

## PARTIES

1. Plaintiff Alena Kelly is currently a resident of the State of Florida and, at all relevant times, was a student at DMU.

2. Defendant Des Moines University is located in and a citizen of Des Moines, Iowa.

3. Defendant Dr. Kimberly Brown is a resident of Iowa and DMU's Vice President of Enrollment Management and Student Affairs. Dr. Brown is being sued in her individual capacity.

4. Defendant Alicia Lynch is a resident of Iowa and DMU's Director of Student Affairs. Ms. Lynch is being sued in her individual capacity.

5. At all times relevant hereto, Defendant DMU was in a contractual relationship with Ms. Kelly.

6. At all times relevant hereto, and in all their actions described herein, Defendants' actions took place in Des Moines, Iowa.

**VENUE & JURISDICTION**

7. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity of citizens) because the amount in controversy exceeds $75,000.00, and the parties are diverse. This Court has personal jurisdiction over the parties because, *inter alia*, Defendants are located in the Southern District of Iowa.

8. Venue is proper in the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b) in that the claims arose in this district, and Defendant is located in this district.

9. Costs and attorney's fees are sought.

**GENERAL FACTUAL ALLEGATIONS**

10. Ms. Kelly matriculated to the DMU College of Podiatric Medicine and Surgery program in August 2016.

11. She proved to be a successful part of the DMU Class of 2020, was actively involved with multiple political and social groups on campus, and was well respected by her professors and peers. Until February 4, 2018, Ms. Kelly had never been warned, let alone sanctioned, for any academic or non-academic reason.

12. Kelly's progress toward completing her medical degree was abruptly halted following a February 4, 2018 non-university sanctioned class Super Bowl party.

13. In the weeks leading up to the party, Ms. Kelly had been the target of multiple sexual advances by her classmate, Greg Sheremata. Specifically, Mr. Sheremata made comments to Ms. Kelly such as, "I'm going to drag you to Detroit with me. I'm going to [expletive] you" and "I want to [expletive] you in a study room."

14. Frustrated by Mr. Sheremata's pressure to engage in an adulterous relationship with him, Ms. Kelly approached Mr. Sheremata's wife during the Super Bowl party and informed her of Mr. Sheremata's unwelcomed advances.

15. Mr. Sheremata then shared Ms. Kelly's interaction with his wife with his good friend and class president, Tyler Sten, and classmate, Sarah Tamarro.  Not surprisingly, Mr. Sheremata failed to tell either student that the interaction between Ms. Kelly and his wife stemmed from his own actions, giving the appearance to both that Ms. Kelly was randomly and maliciously attempting to cause him harm.

16. In the six weeks following the party, Mr. Sten, Ms. Tamarro and Mr. Sheremata undertook an unrelenting and, ultimately, successful attempt to remove Ms. Kelly from the class.

17. This effort was well-supported by their peers, and, unfortunately, Dr. Brown and Ms. Lynch also undertook monumental efforts to protect the reputations of Mr. Sten, Ms. Tamarro, and Mr. Sheremata.

18. Just one day after the Super Bowl party, Ms. Tamarro submitted a conduct report to Dr. Brown alleging Ms. Kelly's violation of DMU's Integrity Code.  The Integrity Code, which promotes honesty, accountability, collaboration, and inclusiveness as the basic tenets of integrity, is upheld by DMU's Conduct Office.

19. The conduct report detailed multiple aspects of Ms. Kelly's personal life, including Ms. Kelly's interactions with Mr. Sheremata's wife at the Super Bowl party.  Ms. Tamarro alleged that Ms. Kelly (1) showed a nude photo of herself to a classmate; (2) had "outbursts" during lectures; (3) engaged in illicit drug use and frequent alcohol consumption; (4) sent inappropriate Snap Chats to her peers; and (5) had brought her personal life into a school setting.  Notably, four of the five alleged misbehaviors occurred outside of any structured academic setting.

20. Although Ms. Kelly acknowledges having shown a picture of herself to classmate Sean Hayes, she adamantly denied, and still denies, having shown the picture to anyone else. Unfortunately, it became obvious to Ms. Kelly that Mr. Hayes discussed the private photo with Mr. Sheremata and Mr. Sten.

21. On February 6, 2018, Dr. Brown interviewed Ms. Tamarro. While Ms. Tamarro claimed to have personal knowledge of Ms. Kelly's prior marriage and divorce, she admitted to having no personal knowledge of Ms. Kelly's alleged misbehavior. For example, Ms. Tamarro had not personally seen any photos of Ms. Kelly.

22. Ms. Tamarro accused Ms. Kelly of having "outbursts" in lectures; however, she admitted that perhaps only one faculty member may have noticed the purported "outbursts." Ms. Tamarro did not personally observe any interaction between Ms. Kelly and Mr. Sheremata's wife during the Super Bowl party, nor had she ever witnessed Ms. Kelly drinking alcohol or being intoxicated on campus. Ms. Tamarro's only explanation for the accusation that Ms. Kelly had brought her personal life into a school setting was that since Ms. Kelly's divorce, she had gone from a quiet, private student to one who was dating a peer and "inserting herself into different lunch tables."

23. That same day, Dr. Brown separately interviewed Mr. Hayes and Mr. Sheremata.

24. Dr. Brown pressed Mr. Hayes for personal details of his involvement with Ms. Kelly, asking specific questions regarding his relationship with her and his opinions of her alcohol consumption. Dr. Brown further asked Mr. Hayes if he had witnessed any of Ms. Kelly's alleged outbursts, which Mr. Hayes described only as one "minor incident in Dr. Mahoney's class."

25. Repeating her trend of discussing Ms. Kelly's personal relationships, Dr. Brown also asked Mr. Sheremata about the events which occurred during the Super Bowl party—the

response to which was conveniently redacted from the documents provided to Ms. Kelly. However, when asked about Ms. Kelly's alleged outbursts, Mr. Sheremata corroborated Mr. Hayes's interpretation of such, noting that Professor Mahoney "made a quick comment about the situation, but did not seem to be bothered" by it.

26. Following these interviews, on February 6, 2018, Dr. Brown finally discussed with Ms. Kelly the allegations against her. Prior to the February 6, 2018 meeting, Ms. Kelly was entirely unaware of any interpersonal issues with her peers.

27. Ms. Kelly made clear to Dr. Brown that she considers herself a class leader and gets along with her classmates. Feeling the need to defend herself, Ms. Kelly disclosed personal health information to Dr. Brown, including her collagen disorder and need for genetic testing, her divorce, and her previous struggles with mental health. Ms. Kelly denied having missed classes, exams, or changing any of her routines or behaviors based on any situation with classmates.

28. Based on this interview, Dr. Brown concluded that Ms. Kelly did not violate the Integrity Code.

29. However, rather than provide support for Ms. Kelly, who was clearly distressed after learning of her classmates damaging accusations, Dr. Brown felt it necessary to inform Ms. Kelly that if she retaliated against anyone who she thinks may have reported her, it could be a violation of the Integrity Code.

30. Ms. Kelly also relayed Mr. Sheremata's comments to Dr. Brown during their February 6 meeting and voiced her concern for being one of just ten females in her class.

31. This concern was met only with a mere suggestion that Ms. Kelly follow-up with the Title IX officer regarding the sexual harassment. Dr. Brown did not report Mr. Sheremata's sexual harassment against Ms. Kelly to any appropriate party.

32. Dr. Brown proceeded only to protect Mr. Sheremata from any consequences which might arise from Ms. Kelly's reporting of his comments.

33. Unfortunately, and no doubt fueled by Dr. Brown freely discussing personal aspects of Ms. Kelly's life with multiple classmates, Ms. Kelly's relationship with her classmates continued to disintegrate.

34. In an effort to protect her reputation, Ms. Kelly attempted to have discussions with several classmates regarding the conduct report. These attempts proved futile and more damaging that Ms. Kelly could ever have anticipated.

35. Apparently unsatisfied with Dr. Brown's conclusion that Ms. Kelly did not violate the Integrity Code, Ms. Tamarro, Mr. Sheremata, and Mr. Sten continued their attempt to damage Ms. Kelly's reputation. Less than two weeks after the first round of interviews, DMU initiated another full investigation based on these students' continuing allegations against Ms. Kelly.

36. On February 19, 2018, after interviewing multiple other students, Dr. Brown interviewed Ms. Kelly. Remarkably, Dr. Brown admitted to discussing Ms. Kelly's situation with a full 25% of Ms. Kelly's classmates.

37. Yet again, Ms. Kelly was the last to be interviewed and the last to be told of the continued allegations against her. In this interview, Dr. Brown interrogated Ms. Kelly, at one point asking her if she thought her problems were the result of her refusal to have an affair with Mr. Sheremata.

38. Ms. Kelly reiterated her desire to have a frank discussion with Ms. Tamarro regarding the initial incident report and assured Dr. Brown that her attempts at these discussions were not motivated by any ill-will or intent to retaliate.

39. With absolutely no evidence, Dr. Brown then flatly accused Ms. Kelly of illicit drug abuse. Ms. Kelly voluntarily submitted to drug testing—the results of which were completely negative.

40. Despite lacking any verifiable evidence of wrongdoing, Ms. Lynch issued Ms. Kelly a written warning for breaching the peace and retaliating or engaging in threatening behavior.

41. Still apparently unsatisfied with the written warning, Ms. Kelly's classmates persisted in their efforts to oust Ms. Kelly from DMU. Obviously worried by his own sexual harassment of Ms. Kelly, Mr. Sheremata again contacted the Conduct Office to accuse Ms. Kelly of inappropriate behavior.

42. On February 20, 2018, Dr. Brown and Ms. Lynch met with Mr. Sheremata and shared confidential conversations with him which had taken place between themselves and Ms. Kelly. Dr. Brown advised him that he should "choose his words carefully" considering that the terms "sexual harassment" and "locker-room talk" had been brought up in their interviews with Ms. Kelly.

43. In the continuing saga of gossip, speculation, and misinterpretation, Ms. Tamarro returned to the Conduct Office on February 26, 2018, to accuse Ms. Kelly of confronting her in the cafeteria and sending threatening text messages. However, the only evidence presented included a screenshot of a text message in which Ms. Kelly told her "I'm sorry I used the f word in our conversation. I care about you and hope that we both continue to grow and become the best possible we can be. Let's not let pettiness cloud our success. We both know there are bigger things in life that are more important. Nothin [sic] but love and support for you, Sarah."

44. Although Ms. Lynch attempted to verify the alleged cafeteria confrontation by searching campus security video footage, she again found no evidence of any wrongdoing by Ms. Kelly.

45. However, rather than assure Ms. Tamarro that Ms. Kelly was remorseful and attempting to make amends, Ms. Lynch advised her to sit away from Ms. Kelly, block her on Facebook, and suggested she obtain a no-contact order.  Still fixated on the Integrity Code, Ms. Lynch also advised Ms. Tamarro to return to the Conduct Office if any of Ms. Kelly's behavior felt retaliatory or like a violation of the Code.

46. On February 28, 2018, Mr. Sten again met with the Conduct Office to accuse Ms. Kelly of harassment.  Mr. Sten described this alleged harassment as Ms. Kelly getting his attention for no apparent reason, offering him candy in lecture, commenting on his shoes, and patting him on the back.

47. Despite acknowledging to Mr. Sten that the Conduct Office cannot discuss other students' meetings due to confidentiality, and despite continuously refusing to disclose to Ms. Kelly which students had made complaints, Ms. Lynch went on to tell Mr. Sten that Ms. Kelly had been asked by the Conduct Office to stop texting and contacting him.  Thereafter, Ms. Lynch encouraged Mr. Sten to help "quash" the situation and again reminded him that if there were violations of the Integrity Code, he should come forward.

48. In yet another meeting on March 1, 2018, Dr. Brown met with Ms. Kelly's lab partner, Vahe Matnishian, and asked multiple questions regarding Ms. Kelly's behavior, including whether he had observed any behaviors or actions by Ms. Kelly—such as alcohol consumption, illicit drug use, or attempts to get other students expelled—that would constitute a violation of the Integrity Code.  Mr. Matnishian denied having any such knowledge.

49. Mr. Matnishian returned to the Conduct Office on March 6, 2018, to clarify a text between himself and Ms. Kelly which had been interpreted by the Conduct Office as proof of Ms. Kelly's alleged use of the illicit drug Ecstasy. In fact, he had suggested in the text message that Ms. Kelly get some "Mandy" (a common slang for Ecstasy) to improve her mood and had also mocked Ms. Kelly for having been asked on a date by a classmate.

50. Shockingly, rather than clarify with Mr. Matnishian that the word "Mandy" was referencing a classmate, Ms. Lynch brushed aside any of Mr. Matnishian's culpability for the text and only suggested that if he were aware of any Integrity Code violations, he should share those.

51. On March 8, 2018, Ms. Kelly was notified by Dr. Lisa Streyffeler, Integrity Committee Chair, that she was scheduled for a hearing before the Integrity Committee for alleged violations of the University's Standards for Professional Conduct, including breaching the peace, retaliating or engaging in threatening behavior, and illegal drug use.

52. With this notice, Ms. Kelly finally received a copy of the Case Investigation Report of Ms. Lynch, which partially detailed the original conduct report as well as the initial student interviews.

53. In a written statement to the Integrity Committee in preparation for her hearing, Ms. Kelly provided detailed rebuttals of her alleged misbehavior. While accepting responsibility for making incorrect assumptions about her classmates, Ms. Kelly vehemently denied ever lying or engaging in threatening, intimidating, or retaliatory behavior. Ms. Kelly further provided the Committee with three (3) character references, the majority of which were overwhelmingly positive.

54. Without any evidence of wrongdoing, the Integrity Committee relied entirely on hearsay in their conclusion that Ms. Kelly was responsible for violations of the Integrity Code, including breaching the peace and retaliating or engaging in threatening behavior.

55. As a result, Ms. Kelly was placed on suspension from the program and was barred from University premises during the term of her suspension. Additionally, she was required to complete a substance abuse assessment and undergo a psychiatric evaluation prior to reinstatement to DMU.

56. Given the physical, mental, and emotional toll which the entire situation had taken on Ms. Kelly, she withdrew from the program on April 28, 2018.

57. As a result of Defendants' conduct, Ms. Kelly has lost her personal and financial investment in several years of education and has suffered severe emotional distress.

58. It has been necessary for Ms. Kelly to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## FIRST CAUSE OF ACTION

### *BREACH OF CONTRACT*
### Against Des Moines University

59. Each of the allegations set forth in paragraphs 1 through 58, inclusive, are hereby incorporated by this reference as if realleged fully herein.

60. Courts recognize that the basic legal relation between a student and a private university or college is contractual in nature.

61. Students are entitled to rely upon the procedures and guidelines a school voluntarily promulgates in any disciplinary action and a school may not dismiss a student for academic reasons where the decision was made arbitrarily, capriciously or in bad faith.

62. When Ms. Kelly enrolled in the College of Podiatric Medicine and Surgery, DMU entered into an express and implied contract with her in connection with rights explicitly guaranteed by it pursuant to its Student Handbook, and, in this case, DMU's Integrity Committee Policy. The Policy provides that "[i]n situations where the Respondent acknowledges responsibility for a violation, the Integrity Committee will deliberate to determine the appropriate sanction(s)."

63. At all times, Ms. Kelly fulfilled her obligations under the contract by timely paying tuition and fees to DMU.

64. Ms. Kelly never acknowledged responsibility for any violation of the Integrity Code. She did not admit to engaging in any threatening, intimidating, or retaliatory behavior. She certainly did not admit to any breaching of the peace. Through DMU's own drug testing request, Ms. Kelly proved her innocence related to the illicit drug allegations.

65. Because Ms. Kelly never acknowledged responsibility for any violation of the Integrity Code, Ms. Kelly's case was submitted to the Integrity Committee in contravention with its own Integrity Committee Policy.

66. DMU also arbitrarily and capriciously acted by treating Ms. Kelly's private social media messages and showing of a private photo as an Integrity Code violation. Dr. Brown and Ms. Lynch fail to cite any provision of the Integrity Code that permits regulation of Ms. Kelly's campus social media messages and private conversations with her classmates.

67. The Code does not restrict personal relationships outside of a professional setting and is intended to ensure patient care and safety, neither of which were implicated by any of Ms. Kelly's messages or actions which DMU alleged were the basis of her breaching the peace.

68. Ms. Kelly's suspension was not based on a violation of any specific standards, but was based on student gossip, jealousy, and DMU administration's desire to protect the personal reputations of some of its students.

69. DMU did not show Ms. Kelly the specific allegations against her during the investigatory process and it remained unclear which statements were made by which students, and which specific actions by Ms. Kelly were in alleged violation of the rules.

70. Neither Dr. Brown nor Ms. Lynch bothered to give Ms. Kelly written notification of the alleged complaints before any meetings with her, and none of the collected evidence indicates that Ms. Kelly engaged in threatening, inappropriate, or retaliatory behavior.

71. Ms. Tamarro complained of an inappropriate photo but never actually saw the photo herself.  Mr. Sten complained that Ms. Kelly harassed him in class based on his allegation that she tried to get his attention.  Likewise, several other students complained that Ms. Kelly was inserting herself into different friend groups, yet not one student provided any substantial evidence of threats against them.

72. By suspending Ms. Kelly without any substantial evidence of any wrongdoing, the Integrity Committee departed so substantially from any acceptable exercise of professional academic judgment that it acted without any discernable rational basis.

73. Accordingly, there was a contract between Ms. Kelly and DMU, and DMU breached that contract when Ms. Kelly was arbitrarily and capriciously suspended from the College of Podiatric Medicine and Surgery.

74. DMU's failure to abide by its policies and fulfill its contractual obligations have cost Ms. Kelly her investment of several years in her education and over $119,000 in tuition.  She has suffered, and continues to suffer, damages academically, financially, and emotionally.

75. It has been necessary for Ms. Kelly to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## SECOND CAUSE OF ACTION

### *VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972*
**Against Des Moines University**

76. Each of the allegations set forth in paragraphs 1 through 75, inclusive, are hereby incorporated by this reference as if realleged fully herein.

77. Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

78. Title IX applies to all colleges and universities receiving federal funding.

79. Des Moines University receives federal funding, including through its participation in the federal financial aid program and its receipt of federal financial aid funds, and is thus covered by Title IX.

80. Ms. Kelly was the target of multiple unwelcome sexual advances, requests for sexual favors, and other verbal sexual harassment by Mr. Sheremata. Ms. Kelly made clear to him that his behavior was unwelcomed, yet he continued to request nude photographs and make inappropriate sexual comments in Ms. Kelly's presence and therefore created a sexually hostile environment.

81. Dr. Brown had actual knowledge of this harassment and had actual knowledge that Mr. Sheremata's behavior was interfering with Ms. Kelly's academic performance. As the investigating Conduct Officer, Dr. Brown was a college official with the authority to take corrective measures to protect Ms. Kelly.

82. Specifically, in a February 19, 2018 meeting, Ms. Kelly informed Dr. Brown that she was uncomfortable with Mr. Sheremata's comment that he would "drag her to Michigan" and that sexual harassment was a prevalent part of the DMU culture. Further, Dr. Brown acknowledged that a follow-up conversation regarding the sexual harassment was necessary.

83. However, not only did Dr. Brown fail to follow-up or respond to Ms. Kelly's complaints, she also made concerted efforts to protect Mr. Sheremata from any consequences, telling him only that he needed to be cautious with his "locker room talk."

84. As a result of Ms. Kelly's refusal to engage in an affair with him, and her report of his sexual harassment, Mr. Sheremata engaged in a concerted effort to attack Ms. Kelly's reputation and recruit other students to harass her.

85. DMU's failure to investigate Ms. Kelly's allegations of harassment enabled Mr. Sheremata's campaign to continue and in fact facilitated his retaliatory actions by engaging in repeated conduct investigations against Ms. Kelly, involving speaking with and sharing confidential information with a substantial portion of Ms. Kelly's class.

86. The collective result of Mr. Sheremata's statements and actions impacted Ms. Kelly's relationships with all of her classmates, and with school administration, and interfered with her study and academic performance, ultimately resulting in her withdrawal from school.

87. Ms. Kelly was subject to a sexually hostile environment, which interfered with her academic performance, and because Dr. Brown was in a position to take corrective measures yet failed to do so, DMU acted with deliberate indifference towards the harassment in violation of Title IX.

88.     As a result of Defendants' conduct, Ms. Kelly has lost her investment of several years of education and over $119,000 in tuition.  She has suffered, and continues to suffer, damages academically, financially, and emotionally.

89.     It has been necessary for Ms. Kelly to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

### THIRD CAUSE OF ACTION

*INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*
**Against Dr. Brown and Ms. Lynch**

90.     Each of the allegations set forth in paragraphs 1 through 89, inclusive, are hereby incorporated by this reference as if realleged fully herein.

91.     Dr. Brown, Ms. Lynch, and DMU engaged in outrageous conduct and acted with reckless disregard of the probability of causing her emotional distress.

92.     Dr. Brown and Ms. Lynch were both well aware of the distressing impact of their frequent, baseless interrogations of Ms. Kelly.  After numerous meetings with Dr. Brown and Ms. Lynch, Ms. Kelly left in tears and required intervention from DMU counselors and psychiatrists.

93.     Furthermore, Dr. Brown's accusations of illicit drug use forced Ms. Kelly to travel and pay for her own drug testing at a time when she should have been studying for final exams.

94.     Dr. Brown and Ms. Lynch became fixated on finding Ms. Kelly guilty of violating DMU's Integrity Code.  Throughout the course of the investigation, Dr. Brown and Ms. Lynch engaged in an immature game of "he said-she said," ultimately forcing Ms. Kelly to withdraw from the program entirely.

95.     As a result of Defendants' conduct, Ms. Kelly has lost her investment of several years of education and over $119,000 in tuition.  She has suffered, and continues to suffer, damages academically, financially, and emotionally.

96.     It has been necessary for Ms. Kelly to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Ms. Kelly demands a jury trial for all issues in this matter.

## RELIEF REQUESTED

WHEREFORE, Ms. Kelly prays that this Honorable Court enter judgment in her favor, and against the Defendants: (a) for reimbursement of the full amount of Ms. Kelly's tuition plus accrued interest totaling $119,883.00; (b) for compensatory damages, including lost earnings; (c) for reimbursement of the full amount of expenses Ms. Kelly incurred; (d) for reimbursement of the full amount of Ms. Kelly's attorney's fees; and (e) further relief as justice requires.

DATED this 26th day of April, 2019.

Respectfully Submitted,

**DICKEY & CAMPBELL LAW FIRM, PLC.**

  /s/ Gary Dickey
Gary Dickey            AT0001999
Dickey & Campbell Law Firm, PLC
301 East Walnut Street, Suite 1
Des Moines, Iowa 50309
Telephone: (515) 288-5008
Facsimile: (515) 288-5010
Email: gary@dickeycampbell.com
    and
**THE BACH LAW FIRM, LLC**
Jason J. Bach, Esq.
*Pro Hac Vice Admission Pending*
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89148
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
*Attorneys for Plaintiff*